UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                           Case No. 8:19-cr-605-WFJ-CPT

MICHAEL J. DACORTA

_____/


**REPORT AND RECOMMENDATION**

Before me on referral is Defendant Michael DaCorta's motion to suppress statements he made to law enforcement during the execution of a search warrant at his home in April 2019.  (Doc. 43).  In support of his motion, Mr. DaCorta argues that his statements were the product of a custodial interrogation conducted without the benefit of the warnings required under *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny.  The government opposes Mr. DaCorta's motion, claiming that he was not in custody at the time he made the challenged admissions and thus did not need to be advised of his *Miranda* rights.  (Doc. 49).

I held a full-day evidentiary hearing on the matter, during which Internal Revenue Service (IRS) Special Agent Shawn Batsch, Federal Bureau of Investigation (FBI) Special Agent Richard Volp, and attorney Burton Wiand testified for the government, and Mr. DaCorta's wife, Carolyn DaCorta, and his daughter, Crystal DaCorta, testified for the defense.  (Doc. 62).  In accordance with the Court's directive

(Doc. 61), the parties thereafter submitted proposed findings of fact and conclusions of law based on the evidence adduced at the hearing (Docs. 68, 69).  Following a careful review of those submissions, as well as the other pertinent portions of the record, I respectfully recommend that Mr. DaCorta's motion be denied.  Below are my findings of fact and conclusions of law in support of that recommendation.

## I.

Mr. DaCorta stands charged in a superseding indictment with conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349; engaging in an illegal monetary transaction, in violation of 18 U.S.C. § 1957; and submitting a false and fraudulent statement on a federal income tax return, in violation of 26 U.S.C. § 7206. (Doc. 39).  A trial is scheduled in this case for the February 2022 trial term.  (Doc. 71).

The above charges stem from a multi-year investigation supervised by the FBI and the IRS into the business dealings of various companies operated by Mr. DaCorta and others, collectively known as Oasis International Group (Oasis).  (Doc. 62 at 8, 13, 52–53, 97, 101, 162–63; Doc. 68 at 2; Doc. 69-1).  Agents Volp and Batsch, both seasoned law enforcement officers, were the lead investigators on this joint effort. (Doc. 62 at 7–8, 13, 19, 52–53, 140–41, 177–78).

Based on the evidence developed during the course of its investigation, the government alleges that Mr. DaCorta and a number of his co-conspirators utilized Oasis to orchestrate a "Ponzi"-style investment fraud to swindle over $70,000,000 from several hundred unwitting investors.  (Doc. 39 at 1–7; Doc. 62 at 7–8, 13, 52–53, 101, 231–32; Doc. 68 at 2).  The government further avers that Mr. DaCorta and his

2

cohorts used some of the proceeds from this scam for their personal benefit, including to purchase "million-dollar residential properties" and "high-end vehicles." (Doc. 39 at 1–7; Doc. 62 at 12–14; Doc. 68 at 2).

Independent of the FBI and the IRS's investigation, the Commodities Futures Trading Commission (CFTC) performed its own examination of Oasis's financial activities. (Doc. 62 at 34, 101–02, 163; Doc. 68 at 8 n.6). As a result of that probe, the CFTC filed a complaint against Mr. DaCorta and his associates in April 2019, alleging that they violated various provisions of the Commodities Exchange Act and its implementing regulations. *See Commodity Futures Trading Comm'n v. Oasis Int'l Grp., Ltd.*, No. 8:19-cv-886-VMC-SPF, (Doc. 1) (M.D. Fla. Apr. 15, 2019). The same day, a District Judge in this Division, the Honorable Virginia M. Hernandez Covington, issued a Temporary Restraining Order (TRO) against Mr. DaCorta's group and appointed Mr. Wiand to serve as a receiver for Mr. DaCorta's various investment entities—namely, Oasis and several related companies. *Id.* at (Doc. 7). Mr. Wiand's responsibilities in that role included marshalling the receivership's assets at the behest of the Court and distributing the proceeds from the sale of those assets to the victims of the alleged fraudulent scheme. *Id.*; (Doc. 62 at 101–03).

Shortly after the entry of the TRO, law enforcement procured a warrant to search Mr. DaCorta's two-story residence in Lakewood Ranch, Florida. (Doc. 62 at 11–13; Doc. 69-1 at 45–46, 49–50). Situated at the end of a cul-de-sac in a gated community, Mr. DaCorta's home consisted of, *inter alia*, five bedrooms, four bathrooms, an office, a sitting room with a fireplace, a living room, a bonus room, an

exercise room, a billiards room, and a screened-in lanai and pool area that extended across the entire back of the house and part of the side.  (Doc. 62 at 12–13, 221–22, 230, 257; Docs. 82-1, 82-2); Def. Exh. 6.  The warrant also authorized law enforcement to seize three automobiles—a Maserati sports car and two Land Rover sports utility vehicles—which were titled in Mr. DaCorta's name and which were believed to be kept at his home.  (Doc. 62 at 14, 34, 172, 258–59; Doc. 69-1 at 49–50); Def. Exh. 6.

At approximately 7:05 a.m. on April 18, 2019, agents Batsch and Volp led a team of approximately eleven law enforcement officers[1] to Mr. DaCorta's residence to execute the warrant.  Gov't Exhs. 2, 3; (Doc. 62 at 8, 14, 77, 82, 158–59, 176–78, 194, 211; Doc. 82-4).  Video surveillance from outside the home shows that, by the time the search team arrived, it was already light outside, and the sun was shining.  Gov't Exhs. 2, 3.  Mr. Wiand and two representatives from the CFTC, Joe Mettenberg and Elsie Robinson, accompanied the search team to the house but did not participate in the initial entry into the residence.  (Doc. 62 at 34–35, 88–89, 101, 110–14, 137, 159). The members of the search team wore ballistics vests bearing law enforcement insignia and had been informed in advance that Mr. DaCorta had multiple dogs, likely possessed a weapon,[2] and lived at the house with several other family members.  Gov't

---

[1] The number of officers comprising the search team was not clearly established at the hearing.  *See*, *e.g.*, (Doc. 62 at 82, 158, 132, 176–77, 210–11); Gov't Exhs. 2, 3.  In his post-hearing submission, Mr. DaCorta provides varying estimates for that number, including "eight to ten" (Doc. 69 at 2, 5, 11) and "at least eleven," *id.* at 2, 11.  My estimate of roughly eleven search team members is predicated on the law enforcement sign-in sheet maintained in connection with the search (Doc. 82-4), as well as the other evidence introduced at the hearing.

[2] Officers later identified—but did not seize—a firearm found in the home.  (Doc. 62 at 9, 78–79, 94, 151).

4

Exhs. 2, 3; (Doc. 62 at 10, 77–79, 142, 159–61).  All the officers possessed a firearm, and at least one carried a large battering ram.  Gov't Exhs. 2, 3; (Doc. 62 at 9–10, 142, 179–80, 192, 194, 200, 208).

As evidenced by a Ring doorbell video recovered from Mr. DaCorta's residence, agents Batsch and Volp, accompanied by the other officers, approached the front porch area, knocked on the main door several times, and announced, "Police with a search warrant."  Gov't Exh. 2; (Doc. 62 at 14–15, 16, 17, 142, 190–91, 237–38).  Based on the perspective provided by the surveillance video, it appears that many of the officers had their weapons drawn in a protective posture, although a few seem to have directed their firearms towards the front of the home.  Gov't Exh. 2; (Doc. 62 at 10, 81–82). Moments later, Mr. DaCorta—who had been sleeping with his wife, Carolyn, in the master bedroom on the first floor—opened the front door in a tank top and boxer briefs, holding a dog by the collar, while a second dog stood nearby.  Gov't Exh. 2; (Doc. 62 at 17–18, 142, 190–91).  Mrs. DaCorta, who was also dressed in her sleepwear, peered out toward the front door from behind a wall in the foyer, a few feet from her husband.  Gov't Exh. 2; (Doc. 62 at 18, 142, 190–91).  The officers standing in and around the exterior vestibule directed Mr. DaCorta to turn around, to place his hands in the air, and to exit the residence.  Gov't Exh. 2; (Doc. 62 at 82, 144).  Mr. DaCorta complied with these commands and walked slowly backwards onto the porch staircase in front of the home.  Gov't Exhs. 2, 3; (Doc. 62 at 82).

Several officers then passed by Mr. DaCorta to conduct a "protective sweep" of the house to ensure it was safe for the search team to enter.  Gov't Exhs. 2, 3; (Doc.

62 at 83, 143–44, 161, 164).  When Mrs. DaCorta attempted to retreat to the master bedroom, a female officer retrieved her but later allowed her to change her clothes before escorting her outside to wait with Mr. DaCorta.  (Doc. 62 at 191–94).  Other officers inside the residence called out the name of Mr. DaCorta's daughter, Crystal, who had recently returned to live at the home after graduating from college.  *Id.* at 14–15, 18, 83, 237–38.  Crystal subsequently emerged from her second floor bedroom and, with her arms raised, descended the main staircase, where waiting officers instructed her to exit the house.  *Id.* at 238–40, 242.  The DaCortas were then told by law enforcement that the officers needed a "few minutes" to make sure no other occupants remained in the residence.  *Id.* at 19, 143, 195, 241.

As the officers dispersed throughout the home, the DaCortas remained in the driveway near the front entrance.  *Id.* at 107–10, 195, 219–21, 245.  While it appears that a few officers lingered outside with the DaCortas at various times, none of the officers handcuffed or physically restrained any of the DaCortas, nor did the officers subject the family to any harsh language, advise the family they were under arrest, or tell the family they could not leave their house.  *Id.* at 107–10, 195, 219–21, 245.  Apart from Mr. DaCorta's initial encounter with the search team, none of the officers directed or aimed their firearms at any of the DaCortas or unholstered their weapons in the family's presence.  *Id.* at 107–10, 195, 219–21, 245.

While these events were unfolding, Mr. Wiand stood near the end of the driveway and faced the home.  *Id.* at 105–07.  From his vantage point, Mr. Wiand observed the search team approach the residence, knock on the door, greet Mr.

DaCorta, and direct him to wait outside while the other officers located Mr. DaCorta's wife and daughter. *Id.* at 105–10. Mr. Wiand also saw Mr. DaCorta's wife and daughter exit the house soon thereafter and join Mr. DaCorta in the front porch area as the officers secured the premises. *Id.* at 105–10. Mr. Wiand did not see any officers point their handguns at the DaCortas, raise their voices with the family, or use any handcuffs or other physical restraints on them. *Id.* at 105–10. Mr. Wiand also did not recall seeing any officers between him and the home for at least a portion of the time the DaCortas were gathered outside. *Id.* at 105–10.

By approximately 7:15 a.m., the officers had completed their protective sweep and cleared the residence. *Id.* at 19, 79, 107, 143, 210, 220, 241. At that point, agents Batsch and/or Volp returned to the front of the house with their weapons holstered, introduced themselves to Mr. DaCorta, explained that the purpose of their visit was to execute a search warrant related to "the Oasis business," and asked to address the matter with him privately. *Id.* at 19–20, 40–41, 84–85, 144, 165. Mr. DaCorta agreed to meet with the agents, and—after some discussion on the matter—it was decided that the three would talk in the billiards room, which was located on the first floor in the back of the home, immediately adjacent to the living room.[3] *Id.* at 19–20, 84–85, 144, 165; (Doc. 82-2); Def. Exh. 6. Agents Batsch and Volp believed this to be an appropriate location for their interview of Mr. DaCorta because, among other reasons,

---

[3] The billiards room was alternatively referred to during the hearing as the pool room and the entertainment room. *See, e.g.*, (Doc. 62 at 85, 145, 199, 207, 252). I use the designation "billiards room" here for the sake of simplicity. The testimony was unclear as to whether Mr. DaCorta or the agents selected the billiards room for their conversation. *Id.* at 20, 153.

it was far enough removed from the main part of the home such that they could talk to Mr. DaCorta "about the investigation without having to potentially embarrass him or cause undue stress in front of his family," and it was also sufficiently distant from the DaCorta's home office, which was the focal point of the search.  (Doc. 62 at 20–21, 40–41, 144–45, 151, 153–54).

Agents Batsch and Volp then walked with Mr. DaCorta—who, again, was not handcuffed—to the billiards room without placing their hands on his person.  *Id.* at 84–85, 165–66, 199.  At or around the same time, Mr. DaCorta's wife and daughter followed other officers inside the home to the living room, where, it appears, they largely remained for the duration of Mr. DaCorta's interview with agents Batsch and Volp.  *Id.* at 196–200, 242–43.

The billiards room where the interview occurred had a doorway leading into the adjacent living room and was rectangular in shape, except that the side walls on one end were angled to create a large bay-window-like area (but without any seating).  *Id.* at 113–14, 201; (Doc. 82-3); Def. Exh. 7.  The portion of the room with the angled walls had three substantial sets of windows, each outfitted with plantation shutters and each with a view of the lanai at the rear of the residence.  (Doc. 62 at 173; Doc. 82-3).  The room itself was well lit and spacious enough to comfortably fit a decent-sized billiards table positioned in the middle of the room, as well as a wet bar at one end.[4]

---

[4] While agent Batsch testified on cross examination that the billiards room was "probably" "10'x10'" (Doc. 62 at 86), I question the accuracy of this estimate.  Agent Batsch did not appear to be particularly confident in proffering this information, and it appears from the evidence adduced at the hearing that the room is materially larger than agent Batsch suggested.  *See* (Doc. 82-3).

(Doc. 62 at 23–25, 26–27, 113–14, 228–29; Doc. 82-3).   Mr. DaCorta, who was wearing pants by this point, took a seat in a chair against one of the angled walls near the back of the room where the large windows were located and faced the doorway leading into the living room.  (Doc. 62 at 23–25, 26–27, 46–47, 145–46; Doc. 82-3).  A small circular table with an iMac desktop computer sitting on top was situated immediately to Mr. DaCorta's left with two chairs nearby, one several feet to Mr. DaCorta's right near the billiards table and a second on the opposite side of the circular table to his left.  (Doc. 62 at 23–25, 26–27, 145–46; Doc. 82-3).  A large flat screen TV was also affixed to the wall above the circular table.  (Doc. 62 at 24–25; Doc. 82-3).

Agent Volp sat in the chair on the opposite side of the circular table, while agent Batsch sat in the chair angled towards Mr. DaCorta's right-hand side.  (Doc. 62 at 20, 85–86, 145–46, 166–67).   The distance between the agents and Mr. DaCorta was adequate for Mr. DaCorta to walk by the agents if he wished.  *Id.* at 166–67; Doc. 82-3.  Both agents removed their tactical vests before speaking with Mr. DaCorta and kept their weapons holstered for the entire conversation.  (Doc. 62 at 19–20, 29, 145, 147). The door to the room was closed to prevent any interruptions and to avoid tainting the testimony of any other witnesses at the residence.  *Id.* at 27, 37, 151, 200, 228.

It was agreed upon by law enforcement in advance of the interview that agent Batsch would take the lead in questioning Mr. DaCorta, and that agent Volp would be responsible for taking notes.  *Id.* at 91, 146–47.  It was also decided in advance that Mr. DaCorta would not be advised of his *Miranda* rights, and that his interview would not be recorded.  *Id.* at 27, 36, 60, 143, 163–64.

9

Agent Batsch initiated the interview at approximately 7:20 a.m. by reintroducing himself and agent Volp and by informing Mr. DaCorta that he was not under arrest, that he did not have to speak with the agents, and that, if he did talk to the agents, he could stop the interview at any time. *Id.* at 27–28, 30–31, 36, 73–75, 147, 168, 170. After being so advised, Mr. DaCorta agreed to answer the agents' questions. *Id.* at 27–28, 30–32, 73–74, 87, 147, 168.

During the ensuing interview, which lasted no more than two hours, Mr. DaCorta made various statements about his involvement with Oasis, some of which were purportedly incriminating. *Id.* at 32–33, 148–49, 183–84. Despite the seemingly somber subject matter, the agents' conversation with Mr. DaCorta was—in agent Batsch's words—"very friendly." *Id.* at 30–33. The agents did not raise their voices or argue with Mr. DaCorta at any juncture, nor did they threaten or try to intimidate him. *Id.* at 30–31, 148–49. Mr. DaCorta was not handcuffed or restrained in anyway and did not seek to terminate the interview at any point in time, even to take a short break or to use the restroom. *Id.* at 30–31, 148–52. He also did not ask to speak with an attorney or to join his wife or daughter in the adjacent living room. *Id.* at 28, 31, 73–74, 90, 148, 151–52. In addition, Mr. DaCorta did not request any food or beverage, although the officers at one point voluntarily procured a refreshment for him, consisting of either a glass of water or a cup of coffee or both. *Id.* at 31–32, 149–50, 167, 173–74. No one other than Mr. DaCorta and the two agents were present in the billiards room throughout the entirety of the interview, and no one was stationed

10

on either side of the closed door to guard the room's occupants or to prevent anyone from entering or exiting.  *Id.* at 28–29, 37, 88, 114–15, 148, 152.

The interview proceeded with only a few notable interruptions or disturbances. One of those instances occurred when the family's dogs began barking outside on the lanai.  *Id.* at 88, 149–50, 173–74, 184, 203–04, 247–48.  Mr. DaCorta asked the agents if they wanted him to address the matter, but the agents told him that another officer would take care of it.  *Id.* at 88, 149–50, 173–74, 184.  Mr. DaCorta was amenable to this solution, *id.* at 184, and the dogs stopped barking soon thereafter, *id.* at 203–04, 247–48.

On another occasion, agent Volp overheard Mrs. DaCorta engaged in a "heated argument" with one of the female agents in the living room.  *Id.* at 150, 166, 198–99, 227–28, 246–47.  Although Mrs. DaCorta denied "raising [her] voice" during this encounter, her daughter, Carolyn, acknowledged that Mrs. DaCorta became upset with the officers, which led to a verbal altercation between Mrs. DaCorta and one of the agents.  *Id.* at 227, 246–47.  There was no evidence offered at the hearing, however, that this incident impacted Mr. DaCorta in anyway or that he even expressed any concern about it.

A final instance took place towards the end of the interview when Mr. DaCorta either "agreed or offered" to show the agents where he had concealed certain precious metals he supposedly obtained as proceeds of his alleged fraud.  *Id.* at 32–33, 37, 90, 92, 98, 167–68.  To ensure the safety of the other officers executing the search warrant around the home, agent Batsch accompanied Mr. DaCorta to his primary bedroom to

11

retrieve the coins and then escorted him back to the billiards room to complete the interview. *Id.* at 37, 93–94. Mr. DaCorta was not handcuffed or restrained at any point during the course of this excursion. *Id.* at 219, 252. Nor did agent Batsch place his hands on Mr. DaCorta at any point in time. *Id.* at 98.

At the end of the interview, the agents told Mr. DaCorta that the officers were going to take his vehicles pursuant to the warrant they obtained from the Court. *Id.* at 13–14, 34, 85, 172.[5] They also informed him that the CFTC was on-site and wished to talk to him if he would be agreeable to doing so. *Id.* at 34, 88–89.

Mr. Wiand and the CFTC representatives subsequently met Mr. DaCorta in the living room area and introduced themselves. *Id.* at 112–13. According to Mr. Wiand, Mr. DaCorta appeared at the time to be "jovial" and not at all "distraught or shaken or anything like that." *Id.* at 112–13. Mr. DaCorta also seemed to Mr. Wiand to be free to move around the home, as did Mr. DaCorta's wife and daughter, both of whom—Mr. Wiand noticed—were "walking from one room to another" with "no law enforcement officers interacting with them at all." *Id.* at 111–13.

Mr. Wiand asked Mr. DaCorta if he would speak with Mr. Wiand and the CFTC representatives, and Mr. DaCorta responded in the affirmative. *Id.* at 113. Following a discussion on the matter, Mr. DaCorta proposed that they meet in the

---

[5] Mr. DaCorta's wife appeared to claim at the hearing that, while law enforcement did not tell her and her family "much" as the officers cleared the home, they happened to mention within earshot of Mr. DaCorta that they would "be seizing the cars [that ]day." (Doc. 62 at 195, 200, 205). I did not find this testimony persuasive based on, among other things, my assessment of Mrs. DaCorta's credibility, the absence of any evidence corroborating her statement, and her daughter's concession that she did not learn her car would be seized until later that morning. *Id.* at 243, 244, 245, 249, 259.

billiards room and proceeded to lead the CFTC contingent there. *Id.* at 112–14. According to Mr. Wiand, "nobody was leading [Mr. DaCorta] around" and, in fact, Mr. DaCorta "was the one telling [Mr. Wiand] where [they] were going." *Id.* at 112–13. Agents Batsch and Volp did not accompany the CFTC in returning to the billiards room with Mr. DaCorta. *Id.* at 34–35, 88, 98, 182, 229–30.

The CFTC's discussion with Mr. DaCorta started in the billiards room at around 9:45 a.m. and ended roughly an hour-and-a-half later.[6] *Id.* at 116–17, 119; (Doc. 82-5). Although the officers were still in the process of executing the search warrant while this interview was taking place, no FBI or IRS agents were present for any part of that conversation. (Doc. 62 at 34–35, 88, 98, 114–15, 119–20, 182). During the course of his meeting with the CFTC, Mr. DaCorta twice left and returned to the billiards room without a law enforcement escort. *Id.* at 118–19. By Mr. Wiand's account, the CFTC's discussion with Mr. DaCorta was calm, cordial, and cooperative and, when it was finished, Mr. DaCorta "walked out of the room and went on about his business." *Id.* at 119–20. Mr. Wiand did not see Mr. DaCorta guarded by any law enforcement officers either before or after this meeting. *Id.* at 119, 120–21. And although Mr. Wiand apparently had the authority that day to take dominion and control of the DaCorta home and to require the family to exit the residence, he

---

[6] The government represented at the suppression hearing and confirmed in its post-hearing submission that it will not be seeking to introduce any statements Mr. DaCorta made to Mr. Wiand and the two CFTC representatives. (Doc. 62 at 268–70; Doc. 68 at 8 n.6). Mr. DaCorta stated in his post-hearing submission that this is his understanding as well. (Doc. 69 at 4).

declined to do so and instead "left it to be worked out as to when [Mr. DaCorta could] find another place to live." *Id.* at 129.

While the FBI/IRS and the CFTC were conducting their respective interviews of Mr. DaCorta, his wife and daughter remained in the home. *Id.* at 196–98, 223–24, 228, 242–43. Both claimed during the hearing that they were not allowed to move freely around the house and instead were accompanied by a law enforcement agent at all times. *See*, *e.g.*, *id.* at 192–94, 195–96, 199, 230–31, 235, 243, 246. Mr. DaCorta's daughter also testified that the officers essentially kept her and her mother "in one concentrated area"—i.e., the living room—so they could "keep an eye on" the pair during the search. *Id.* at 246. Mrs. DaCorta additionally recalled one instance where she received a call on her cell phone from her son but, when she attempted to answer the phone, an agent standing nearby instructed her not to do so unless she "put the call on speaker so [the agent could] hear it." *Id.* at 204–05.

Both Mrs. DaCorta and her daughter acknowledged, however, that at no point did any officer tell them they could not leave the residence. *Id.* at 220–21, 224, 244–45. And, despite the claim by Mr. DaCorta's daughter that she "had no freedom to move around the house," Mrs. DaCorta conceded on cross examination that her daughter "was very free to leave." *Id.* at 220, 253. Indeed, when Mr. DaCorta's daughter advised the officers at one juncture that she had a "spin class" that morning, she was informed she could attend the class if she wished. *Id.* at 220–21, 243–44, 258–59. She subsequently learned, however, that she would have to find an alternative form of transportation to get there, as her car—one of the two Land Rovers—was

14

being seized.  *Id.* at 258–59.  In the end, Mr. DaCorta's daughter elected to stay at the residence with her mother and father.  *Id.* at 259.

The FBI and IRS agents completed their search of the DaCorta home by approximately 12:30 p.m. and then left the area.  *Id.* at 77, 210; Def. Exh. 7.  Law enforcement officers arrested Mr. DaCorta approximately eight months later following his indictment in this case.  (Doc. 1).

## II.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In its seminal decision in *Miranda v. Arizona*, the Supreme Court held that law enforcement agents cannot conduct a custodial interrogation of a suspect without first advising the suspect of "his or her rights against self-incrimination."  *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007) (per curiam) (citing *Miranda*, 384 U.S. at 445).[7]  The purpose of this prophylactic measure is "to preserve [the Fifth Amendment's] privilege during incommunicado interrogation of individuals in a police-dominated atmosphere," where "inherently compelling pressures" can work "to undermine [an] individual's will to resist and compel him to speak where he would not otherwise do so freely."  *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (quoting *Miranda*, 384 U.S. at

---

[7] There is no dispute here that agents Batsch and Volp's questioning of Mr. DaCorta constituted an "interrogation" as that term is construed under *Miranda*.  *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (noting that "interrogation" for purposes of *Miranda* includes any words or actions by "the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect") (footnotes omitted).

445, 467) (internal quotation marks omitted).  "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).

To trigger the need for *Miranda* warnings, a suspect must be in custody.  *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) (observing that *Miranda* warnings are necessary "only if [the suspect] was in custody at the time he made the statements in question").  Custody for purposes of *Miranda* "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012).  As such, *Miranda* custody is "not necessarily" the same as a "seizure" under the Fourth Amendment and instead requires a "'formal arrest or restraint on [the suspect's] freedom of movement of the degree associated with a formal arrest.'" *United States v. Street*, 472 F.3d 1298, 1310 (11th Cir. 2006) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam); *see also United States v. Phillips*, 812 F.2d 1355, 1359 (11th Cir. 1987) (per curiam) (noting that, in addressing the issue of *Miranda* custody, "the ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest'") (quoting *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984)).

In determining the issue of *Miranda* custody, courts assess whether, under the totality of the circumstances, a reasonable innocent person in the suspect's position

would have felt that he "was not at liberty to terminate the interrogation and leave," and "whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 508–09 (internal quotation marks and citation omitted); *accord Luna-Encinas*, 603 F.3d at 881 (citations omitted).  This inquiry is an objective one.  *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006).  Accordingly, "the actual, subjective beliefs of the [suspect] and the interviewing officer . . . are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) (citing *Berkemer*, 468 U.S. at 420).

When evaluating the totality of the circumstances under this inquiry, courts generally consider a number of non-exclusive factors.  *Howes*, 565 U.S. at 509; *Luna-Encinas*, 603 F.3d at 881 (citations omitted).  These factors include the location of the interview, *Luna-Encinas*, 603 F.3d at 881 (citations omitted); whether the suspect was told that he was not under arrest, that he was not in custody, that he could stop the conversation at any time, and/or that he was free to leave, *United States v. Deason*, 965 F.3d 1252, 1261 (11th Cir. 2020); the presence or absence of physical restraints during questioning, *New York v. Quarles*, 467 U.S. 649, 655 (1984); "whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers[' commands] could be compelled,'" *Street*, 472 F.3d at 1309 (citation omitted); whether the suspect was subject to "psychological pressures 'which work[ed] to undermine [his] will to resist and to compel him to speak where he would not otherwise [have done] so freely,'" *Maryland v. Shatzer*, 559 U.S. 98, 103

(2010) (quoting *Miranda*, 384 U.S. at 467); the duration of the interview, *Luna-Encinas*, 603 F.3d at 881; and whether the suspect was released or arrested following the interrogation, *Beheler*, 463 U.S. at 1122–23.

In the end, a suspect seeking to invoke the protections afforded under *Miranda* bears the burden of showing he was in custody. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing.") (citations omitted);[8] *United States v. Blank*, 2018 WL 4898945, at *5 (M.D. Fla. Oct. 9, 2018) (noting that "the burden is on the defendant to establish that he was in custody" at the time the challenged statements were made) (internal quotation marks and citation omitted); *United States v. Sigouin*, 494 F. Supp. 3d 1252, 1261 (S.D. Fla. 2019) (same) (citation omitted).  On appeal, a district court's factual findings are reviewed for clear error and its application of law to facts is reviewed *de novo*.  *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011) (citation omitted).  A reviewing court, however, will "construe the facts in the light most favorable to the party that prevailed below." *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1301 (11th Cir. 2021) (citation omitted).

After carefully weighing the above factors here, I find that Mr. DaCorta was not in custody at the time he made the challenged statements to agents Batsch and Volp. To begin, the agents' interview of Mr. DaCorta occurred in his own residence.  *Brown*,

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

441 F.3d at 1348 (finding it "significant" that the challenged interview took place in a home where the defendant "often resided").  As the Eleventh Circuit has explained, "[c]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *Id.* (internal quotation marks and citation omitted); *see also United States v. Nobles*, 2019 WL 6133751, at *2 (M.D. Fla. Nov. 11, 2019) (finding that the defendant was not in custody, in part, because his interview with law enforcement transpired in his house during the execution of a search warrant) (citations omitted); *United States v. Neston*, 2007 WL 9760023, at *1 (M.D. Fla. Dec. 18, 2007) (concluding that the defendant was not in custody when he was questioned while officers searched his residence pursuant to a warrant).

The agents also told Mr. DaCorta that he was not under arrest, that he did not have to answer their questions, and that he could terminate the interview at any time. As the government observes (Doc. 68 at 13), the Eleventh Circuit has consistently recognized that admonitions of this nature are a significant consideration in the *Miranda* custody analysis.  *See Brown*, 441 F.3d at 1347 (noting that "the fact that an individual is told he is not under arrest and is free to leave is a fact of substantial importance in determining whether a reasonable person would have felt free to leave"); *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000) (same).

While it is true, as Mr. DaCorta highlights in his post-hearing submission (Doc. 69 at 10), that the agents did not explicitly state he was "free to leave," it is also true that no one told him (or any of his family members for that matter) that they could not

exit the residence.  And it is likewise the case that the only family member who did ask to leave, Crystal, was allowed to do so.  I have not found any Eleventh Circuit decision, nor has Mr. DaCorta cited one, which stands for the proposition that the absence of an explicit free-to-leave instruction under such circumstances deprives the type of admonitions utilized here (i.e., the suspect is not under arrest, does not have to answer the agents' questions, and can terminate the interview at any time) of any meaningful force.  In fact, the case authority from the Eleventh Circuit is to the contrary.  *See, e.g.*, *United States v. Alvarez*, 732 F. App'x 729, 733 (11th Cir. 2018) (per curiam) (determining that the defendant was not in custody, in part, because, although she was "not told that she was free to leave, she also was not told that she could not leave and she never asked to leave") (citing *Phillips*, 812 F.2d at 1357); *United States v. Colon*, 579 F. App'x 791, 793–94 (11th Cir. 2014) (per curiam) (finding the defendant was not in custody where, among other things, he was told by the federal agents "at the outset of questioning that he was not under arrest and that he did not have to talk to them"); *United States v. Oddo*, 133 F. App'x 632, 634–35 (11th Cir. 2005) (per curiam) (concluding that the defendant was not in custody during police questioning in his basement, in part, because the officers informed him "that he was not required to speak with [the officers] or answer any of [the officers'] questions"); *Nobles*, 2019 WL 6133751, at *2 (finding no custody, in part, because the defendant did not ask "to terminate the interview at any time") (citing *Moya*, 74 F.3d at 1119).  Indeed, the Eleventh Circuit in *Brown* quoted with approval the following passage from an Eighth Circuit decision, which essentially equated the importance of law enforcement's

20

admonition that a suspect is free to stop an interview with an instruction that he is free to leave:

> That a person is told repeatedly that he is *free to terminate an interview* is powerful evidence that a reasonable person would have understood that he was free to terminate the interview.  So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review, *United States v. Lee*, 699 F.2d 466, 467–68 (9th Cir.1982) (per curiam)), holds that a person was in custody after being clearly advised of his freedom to leave *or* terminate questioning.

*Brown*, 441 F.3d at 1347–48 (emphasis added) (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)).

That Mr. DaCorta indicated he understood the agents' instructions before agreeing to speak to them and did not subsequently ask to end the interview or leave the billiards room enhances the weight to be afforded to these admonitions.  *See Deason*, 965 F.3d at 1261 (observing that the defendant's acknowledgement that he was not under arrest, that he was not in custody, and that he could stop the conversation at any time "strengthen[ed] the force of th[os]e instructions") (internal quotation marks and citation omitted).

In addition to these factors, at no point was Mr. DaCorta handcuffed or subjected to any other form of physical restraints. *Brown*, 441 F.3d at 1339 (concluding the defendant was not in custody, in part, because he was "never handcuffed or otherwise physically restrained"); *Moya*, 74 F.3d at 1119 (determining that the defendant was not in custody because, among other things, no handcuffs were

21

employed); *Nobles*, 2019 WL 6133751, at *2 (finding no custody where the defendant was not placed in handcuffs or physically restrained in any way during the interview). Despite Mr. DaCorta's contentions to the contrary (Doc. 68 at 16–17), the fact that one or more agents accompanied him to and from the billiards room for purposes of officer safety does not undermine this finding. *See United States v. Stinson*, 659 F. App'x 534, 536–37 (11th Cir. 2016) ("Although [the defendant] had some restriction in his movement while the search of his home was ongoing, the officers did not restrict his freedom to such a degree that a reasonable innocent person would believe he was in 'custody.'") (citing *Brown*, 441 F.3d at 1348–49); *United States v. Maldonado*, 562 F. App'x 859, 861 (11th Cir. 2014) (per curiam) ("[A]lthough a postal inspector accompanied [the defendant] to the restroom for safety reasons, [her] movements were never restricted[,] and she was free to leave at any time.") (citation omitted); *Brown*, 441 F.3d at 1348–49 (holding that the defendant was not in custody, in part, because "[a]lthough an officer accompanied him throughout the house for safety reasons, he was free to eat, smoke, use the phone, and move about as he wished"); *United States v. Jenkins*, 2021 WL 2339987, at *3 n.3 (M.D. Fla. May 13, 2021) ("'Courts have repeatedly found that the presence of armed officers at the search location and requiring a suspect to be accompanied around the premises does not escalate an interrogation to a degree that makes it custodial.'") (quoting *United States v. Blank*, 2018 WL 4898945, at *5 (M.D. Fla. Oct. 9, 2018) (collecting cases)), *report and recommendation adopted*, 2021 WL 2337740 (M.D. Fla. June 8, 2021).

Moreover, outside of their initial encounter with Mr. DaCorta at the front door, the officers did not brandish their weapons at or around Mr. DaCorta, did not touch him, and did not use a tone of voice or language with him that was threatening, combative, or confrontational. *United States v. Vorasiangusk*, ___ F. App'x ___, 2021 WL 3502956, at *1 (11th Cir. Aug. 10, 2021) (per curiam) (finding no custody where "the agents did not physically touch, threaten, point their guns at, handcuff, or even raise their voices to" the defendant) (citations omitted); *Deason*, 965 F.3d at 1261 (deeming the defendant not to be in custody even though eight officers "approached his house with guns drawn" and then holstered them shortly after their initial arrival) (citation omitted); *United States v. Qose*, 679 F. App'x 761, 765 (11th Cir. 2017) (per curiam) (determining that the defendant was not in custody where, *inter alia*, "the agents' weapons were holstered; at no time did an agent physically touch [the defendant]; [and] he was not handcuffed or restrained in any way"); *United States v. Riquene*, 552 F. App'x 940, 942–43 (11th Cir. 2014) (per curiam) (finding the fact that the defendant "was not handcuffed," and that the officers "did not display weapons" or "use force against [him]" evidenced that he was not in custody); *Luna-Encinas*, 603 F.3d at 881–82 (concluding that the defendant was not in custody despite officers first encountering him with their guns drawn in a protective posture when entering the property). Quite the opposite. The evidence admitted at the hearing revealed that the agents' interview with Mr. DaCorta was instead calm, cordial, and "very friendly." *See Vorasiangusk*, 2021 WL 3502956, at *1 (making a non-custody finding where the

23

suspect's interview "was calm and cordial").  Even Mr. DaCorta admits in his post-hearing submission that the agents "were polite in questioning him."  (Doc. 69 at 16).

Furthermore, Mr. DaCorta's discussion with the agents was conducted within the comfortable confines of a well-lit room largely dedicated to—of all things—the game of billiards.  And although the door to the room was closed during the interview, no one was stationed at the door preventing Mr. DaCorta from leaving, and there was sufficient room for him to walk past the agents had he so desired.  Mr. DaCorta was also provided refreshments while he spoke to the agents.  *Howes*, 565 U.S. at 515 (finding the defendant was not in custody, in part, because he "was interviewed in a well-lit, average-sized conference room, where he was 'not uncomfortable,'" and "was offered food and water").  Such environs, coupled with the agents' respectful questioning and treatment of Mr. DaCorta, hardly "present[ ] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Id.*  at 509.  Nor is there any evidence that the agents subjected Mr. DaCorta to the kind of "psychological pressures which [would] work to undermine [his] will to resist and to compel him to speak where he would not otherwise [have done] so freely."  *Shatzer*, 559 U.S. at 103 (internal quotation marks and citation omitted).

Mr. DaCorta's reliance on the fact that he was apart from his wife and daughter during the interview is unavailing.  (Doc. 43 at 3–4, 10–11; Doc. 69 at 12–15).  While isolating a suspect "may contribute to a coercive atmosphere by preventing family members . . . who may be sympathetic from providing either advice or emotional support," simply taking a suspect "aside for questioning . . . does not necessarily

convert a 'noncustodial situation . . . to one in which *Miranda* applies.'"   *Howes*, 565 U.S. at 512 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 494, 495 (1977) (per curiam)). Here, Mr. DaCorta agreed to be interviewed in a quiet space within his own home so that he and the agents could have some privacy while the search was being conducted. In addition, as mentioned previously, Mr. DaCorta never asked to speak with his family at any point in time.   *See Colon*, 579 F. App'x at 793–94 (finding the fact that the defendant did not ask to end the interview or speak with other third parties to be persuasive on the issue of custody).   And, although his family was not sitting with him in the billiards room, they were nearby in the adjoining living room.   *See Oddo*, 133 F. App'x at 633–34 (finding no error in law enforcement's decision to interrogate the defendant and his wife separately in the basement of the defendant's home).

As for the duration of Mr. DaCorta's interview with agents Batsch and Volp, the Eleventh Circuit has held "'[t]here is no fixed limit to the length of questioning.'" *United States v. Medina*, 167 F. App'x 161, 166–67 (11th Cir. 2006) (per curiam) (quoting *United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001)).   In fact, the Eleventh Circuit has sanctioned suspect interviews far longer than Mr. DaCorta's, which, as noted above, took no more than roughly two hours.   *See*, *e.g.*, *United States v. Caswell*, 788 F. App'x 650, 653 (11th Cir. 2019) (per curiam) (concluding that three-hour-long questioning by six or seven officers at the defendant's home was not custodial); *McDowell*, 250 F.3d at 1363 (holding four-hour interview not custodial);

*Muegge*, 225 F.3d at 1269, 1271 (finding two-and-a-half-hour interrogation not custodial).

Finally, Mr. DaCorta was not arrested on the day of the search and, indeed, went "about his business" at the conclusion of the CFTC interview.   Courts have determined that a suspect being permitted to return to his "usual environment" following questioning augurs against a finding of *Miranda* custody.   *See Howes*, 565 U.S. at 515–17 (citing *Shatzer*, 559 U.S. at 113); *Beheler*, 463 U.S. at 1122–25.

The fact that law enforcement ultimately seized the family's vehicles on the day of the search does not alter my conclusion.  (Doc. 69 at 7, 15).  As an initial matter, Mr. DaCorta did not learn that his cars were being seized until *after* he made the challenged statements to agents Batsch and Volp.   Even so, there was nothing to prevent him from walking to the home of a nearby neighbor or friend within his enclave, or—if that was too embarrassing or challenging—from calling a cab or a ride share.   Nor was there anything precluding him from taking an even more direct and straightforward measure to terminate his interview with the agents—namely, by not talking to them.

The Eleventh Circuit's decision in *Brown* is instructive in this regard.  In that case, law enforcement officers searching the defendant's home confiscated his shoes, requiring him to depart his home barefoot if he wanted to leave.  *Brown*, 441 F.3d at 1349.  The court ultimately gave that evidence little weight because the defendant had "other options (albeit imperfect ones)" for exiting the house.  *Id*.  The court also observed that the defendant "never exercised the most basic method at his disposal for

26

avoiding discussions with police—simply not talking to them." *Id.*  In the end, the court concluded that the fact the police took the defendant's shoes, "standing alone, [could not] convert what [was] a non-custodial situation into a custodial arrest," given that the defendant was questioned in a familiar setting, was never handcuffed or otherwise physically restrained, was told he could leave, and was unable to point to any "other indicia of coercion" to buttress a finding of *Miranda* custody.  *Id.*

Mr. DaCorta's effort to extract support for his custody argument from the testimony of his wife and daughter does not survive scrutiny.  To begin, neither of these family members was in the billiards room when Mr. DaCorta made his alleged admissions to agents Batsch and Volp.  Instead, their information was largely limited to events of which Mr. DaCorta was not a part or even aware.

Putting aside this threshold issue, I did not find the testimony of Mr. DaCorta's wife and daughter to be particularly persuasive on the custody question.  They both exhibited an understandable bias towards Mr. DaCorta, and their testimony—especially that of Mrs. DaCorta—conflicted with other evidence in the record as well.  By way of example, Mrs. DaCorta stated on direct examination that she "didn't feel we had *any freedom at all the entire time* that th[e officers] were" in her home and that she and her daughter were essentially confined to the living room (absent an occasional trip to the bathroom, etc.).  (Doc. 62 at 204–206) (emphasis added).  Yet, Mr. Wiand—a Court-appointed receiver and barred attorney whose testimony I found to be quite credible—stated that he observed Mrs. DaCorta and her daughter, along with Mr. DaCorta, moving about the residence with little or no restrictions when Mr. Wiand

27

entered the home in the middle of the search.  Mrs. DaCorta's suggestion that none of her family members were free to leave the home, *id.* at 223, was similarly not believable, as both she and her daughter, Crystal, conceded on cross examination that Crystal could have departed the house when she asked to do so, *id.* at 258–59.

Finally, a fair portion of the testimony offered by Mrs. DaCorta and her daughter on the free-to-leave question centered around their claim that they were required to ask for law enforcement's permission to go anywhere in the house and that, even then, they were always accompanied by an officer.  Assuming for the sake of argument that they did, in fact, need such permission (a finding I do not make), there was no credible testimony that any member of the DaCorta family was ever *denied* the freedom to move around the house (albeit perhaps with an escort) or to exit the residence altogether.

In sum, the evidence and testimony adduced at the hearing revealed that Mr. DaCorta voluntarily spoke with law enforcement officers for no more than two hours after retreating to a quiet and comfortable setting within his own home; that agents Batsch and Volp told Mr. DaCorta that he was not under arrest, did not have to speak with the agents, and could end the interview at any time; that Mr. DaCorta was never handcuffed, physically restrained, or coerced into speaking with the agents; that Mr. DaCorta never asked to terminate the interview or to speak with anyone outside the billiards room, including his wife and daughter, who were both close by; that he was never subjected to the kind of psychological pressures which would undermine his will to resist and to compel him to speak where he would not otherwise have done so freely;

28

and that, when the officers completed their search of Mr. DaCorta's residence, they left without arresting him.  Taken as a whole, these circumstances do not warrant a finding of *Miranda* custody.  To paraphrase the Eleventh Circuit's decision in *Luna-Encinas*:

> [Mr. DaCorta's interview with the agents] did not involve the type of "highly intrusive" coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made.  The totality of the circumstances were such that a reasonable person in [Mr. DaCorta's] position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else.  No *Miranda* warnings were required at the time.

*Luna-Encinas*, 603 F.3d at 882 (quoting *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004)).

The three cases upon which Mr. DaCorta primarily relies are unpersuasive.  *See* (Doc. 43 at 9–11).  All of these decisions are from other circuits and are not binding on the Court.  *See Pitts v. United States*, 4 F.4th 1109, 1116 n.3 (11th Cir. 2021) ("[Out-of-circuit] decisions aren't binding on any courts in this or any other circuit outside [the rendering circuit].").  They are also distinguishable.

In the first case—*United States v. Cavazos*, 668 F.3d 190 (5th Cir. 2012)—the Fifth Circuit affirmed a lower court's determination that the defendant was subjected to custodial interrogation during an hour-long, in-home detention.  *Id.* at 191.  There, about fourteen law enforcement personnel barged into the defendant's residence around five in the morning, rushed into his bedroom, handcuffed him, and took him to a location in the house separated from his spouse and young children.  *Id.* at 191–

29

92, 194.  The defendant was thereafter uncuffed and asked by two agents if there was a private room where they could speak to him.  *Id.* at 192.  Once in that room, the agents informed the defendant that their interview of him was "non-custodial," that he was free to get something to eat or drink while speaking with the agents, and that he was also free to use the bathroom.  *Id.*  They then questioned him for more than an hour about his alleged sexually explicit communications with a minor female without advising him of his *Miranda* rights.  *Id.*

At one point in the interrogation, the defendant asked to call his brother, who was also his work supervisor, so that he could tell his brother he expected to arrive late to his job that day.  *Id.*  The agents acquiesced to the defendant's request but demanded that they be allowed to listen in on the defendant's conversation.  *Id.*  Eventually, the defendant acknowledged his involvement in the alleged criminal conduct and agreed to write a statement affirming his admission.  *Id.*  About five minutes into committing his confession to paper, however, the agents formally arrested the defendant.  *Id.*

The Fifth Circuit found that these facts, when viewed "in the light most favorable to" the defendant, "indicate[d]" that he was in custody during his interrogation.  *Id.* at 194.  In doing so, the court noted a prior opinion in which it held that a "'detention of approximately an hour raises considerable suspicion'" supporting a custody finding.  *Id.* at 194 n.1 (quoting *United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990)).

The circumstances in *Cavazos* are materially different from those present in this action.  Unlike in *Cavazos*, law enforcement here executed the search warrant at the DaCorta's residence during the daytime, did not physically barge in on Mr. DaCorta while he was sleeping in his bedroom, and did not handcuff him at any point.  They also made clear to Mr. DaCorta that he was not under arrest, that he did not have to talk to them, and that he could terminate the conversation at any time.  *Cf. id.* at 195 (noting that, "to a reasonable lay person, the statement that an interview is 'non-custodial' is not the equivalent of an assurance that he could 'terminate the interrogation and leave'") (citations omitted).  Further, while there was evidence in *Cavazos* that the defendant perceived he might not be able to leave his house for work, there is no proof here that a reasonable innocent person in Mr. DaCorta's position would have believed he could not end his conversation with the agents and exit the residence if he wished.  Finally, unlike the Fifth Circuit, the Eleventh Circuit does not presume that a suspect is in custody for purposes of *Miranda* where he is interviewed by law enforcement for an hour or more.  *See McDowell*, 250 F.3d at 1363 ("[T]here is no fixed limit to the length of questioning."); *United States v. Aldissi*, 2014 WL 8239387, at *7 (M.D. Fla. Dec. 23, 2014) ("At most, the length of the interview[ ] is a neutral factor in the custody analysis.") (citing *McDowell*, 250 F.3d at 1363), *aff'd*, 758 F. App'x 694 (11th Cir. 2018) (per curiam).

The second decision that Mr. DaCorta cites—*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008)—is similarly unavailing.  In that case, eight law enforcement

officers from several agencies executed a search warrant at the defendant's residence on a military base.  *Id.* at 1078.  All of the officers were armed and "some of them unholstered their firearms in [the defendant's presence] during the search."  *Id.*  The defendant's military supervisor accompanied the officers while the search was being conducted, and, although the government later claimed that the supervisor's presence was for the defendant's "emotional support," the officers never communicated that purpose to the defendant.  *Id.* at 1078–79.  Nor did the defendant interact with his superior before the interrogation commenced.  *Id.*

In the midst of the search, an FBI agent and a local detective approached the defendant and asked if they could speak with him.  *Id.* at 1078.  The FBI agent told the defendant that he was not under arrest, that he was free to leave, that he did not have to speak with them, and that he would not be arrested.  *Id.*  The agent and the detective then escorted the defendant, without handcuffs, to a small, unfurnished storage room in the back of the home.  *Id.*  The FBI agent closed the door and directed the defendant to sit on a box while the agent squatted nearby and questioned the defendant about his involvement in downloading and/or distributing child pornography.  *Id.* at 1078–79.  All the while, the detective—who was armed and wearing a tactical vest—leaned against a wall that was directly adjacent to the storage room's only door.  *Id.*  In addition, at no time during the interrogation was the defendant allowed to confer with his superior.  After twenty or thirty minutes of interrogation, the defendant confessed, and the officers later left the defendant's home without arresting him.  *Id.* at 1079.

On appeal, the Ninth Circuit focused its *Miranda* inquiry on several factors: (1) "the number of law enforcement personnel [present] and whether they were armed;" (2) "whether the suspect was at any point restrained;" (3) "whether the suspect was isolated from others;" and (4) "whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any . . . statements [by the officers] were made." *Id.* at 1084 (footnote omitted). Despite finding that the agent's free-to-leave admonition weighed against a finding of custody, the court determined that the other considerations did not. *Id.* at 1089. In arriving at this conclusion, the court highlighted the defendant's testimony regarding the quandary he found himself in while situated in the storage room with the two officers, with a number of agents from multiple law enforcement entities scouring his home outside the room:

> Most importantly, [the defendant] testified that the presence of agents from three different law enforcement agencies left him with doubt as to whether [the FBI agent] had the authority to pronounce him free to leave. He believed that even if the FBI permitted him to leave the storage room, he might be confronted by members of the other two agencies and forbidden to leave the house. Before he could leave the room, [the defendant also] would have had to deal with [the d]etective [ ], who appeared to be guarding the door to the storage room.

*Id.* at 1088. The court reasoned that the defendant, having been "[e]scorted to a storage room in his own home, sitting on a box, and observing an armed guard by the door, . . . reasonably believed that there was simply nowhere for him to go." *Id.* at 1089. The court also found it relevant that the defendant was never informed that his military

supervisor was at the residence to provide him with emotional support.  *Id.* at 1086–87.

Even relying on the same factors that the Ninth Circuit applied in *Craighead*, I fail to see how this decision compels a finding of *Miranda* custody here.  First, although the search team in this case consisted of more officers than those utilized in *Craighead*, the DaCorta's expansive house was much larger than the presumably more modest confines of the standard military quarters at issue in *Craighead*.  The agents here also testified that there was a concern about Mr. DaCorta having a firearm and two large dogs, and that it was expected there could possibly be other members of Mr. DaCorta's family at the home during the search as well.  It is fair to infer that all of these conditions reasonably warranted a greater law enforcement presence at the DaCorta residence and reduced the risk that a reasonable innocent person in Mr. DaCorta's position would have perceived himself to be helplessly outnumbered by the officers on-site.

Furthermore, the circumstances surrounding the agents' interview of Mr. DaCorta were substantially different from those of the defendant in *Craighead*.  Here, Mr. DaCorta sat in a chair in a comfortably-sized, well-lit billiards room with multiple large windows, which he, himself, offered as an appropriate place to talk, at least with respect to his meeting with Mr. Wiand and the CFTC representatives.  In addition, his family was on the other side of the door had he wished to confer with them and/or end his conversation with the agents.  Moreover, unlike in *Craighead*, there was no guard stationed at the door inside the billiards room, and none of the officers

34

unholstered their weapons following their initial encounter with Mr. DaCorta at the inception of the search.[9]

The final opinion to which Mr. DaCorta looks for support—*Sprosty v. Buchler*, 79 F.3d 635 (7th Cir. 1996)—is likewise inapposite.  In that case, several officers converged on the defendant's mobile home to execute a search warrant as part of an investigation into the defendant's alleged sexual conduct with two minors.  *Id.* at 638. As the officers approached the defendant's residence, they saw him sitting in a nearby car and used their patrol cruisers to blockade his vehicle.  *Id.*  The officers then removed the defendant from his car, confronted him with the search warrant, and escorted him inside the residence, where his mother and a friend were also present.  *Id.*

Once inside, an officer read the defendant his *Miranda* rights, and the defendant signed a written statement acknowledging that he had had been advised of his rights and understood them.  *Id.*  The same officer kept the defendant under close guard while the other officers searched the defendant's trailer and persistently questioned him about the location of certain illicit materials.  *Id.*  The officer guarding the defendant also "strongly discouraged" the defendant's mother and her friend from taking any incoming calls or telling another individual that the residence was being searched.  *Id.* at 641.  At one point, an officer offered the defendant a deal on an unrelated burglary charge pending against the defendant in exchange for information about where he had

---

[9] In fact, as the government pointed out in its post-hearing submission, the Ninth Circuit later distinguished *Craighead* on similar grounds in a decision reversing a district court's suppression order. *See* (Doc. 68 at 23) (citing *United States v. Bassignani*, 575 F.3d 879, 884 n.6 (9th Cir. 2009)).

secreted the incriminating evidence. *Id.* at 639. After a nearly three-hour inquiry, in which officers repeatedly harassed the defendant in front of his mother and her friend about his alleged philandering, the defendant told the police where he had hidden the contraband, and the officers later arrested him. *Id.* Based on these facts, the Seventh Circuit agreed with the lower court's finding that the defendant was in custody, reasoning:

> [T]he way in which the officers initially approached [the defendant], barring his path from the mobile home and escorting him inside, the fact that one armed officer was exclusively occupied with guarding [him] for nearly three hours while four other officers searched, and the persistent requests by the officers that [he] lead them to the incriminating evidence are all factors which[, w]hen viewed in their totality, . . . demonstrate that [his] freedom of action was significantly restrained in a way that increased the likelihood that [he] would succumb to police pressure to incriminate himself.

*Id.* at 643 (citations omitted).

Mr. DaCorta argues that, like the defendant in *Sprosty*, the officers' seizure of his vehicles here "effectively [left him with] no way to leave his home." (Doc. 43 at 10–11). This contention fails for the reasons stated above, including that the evidence does not support a finding that Mr. DaCorta was unable to leave his home without the use of his vehicles, or that he could not have simply stopped talking to the officers. In short, the recitation of the facts in *Sprosty* indicates that the defendant in that case did not enjoy the same liberties as Mr. DaCorta.[10]

---

[10] The other out-of-circuit district court decisions Mr. DaCorta references in his motion to support his contention that the seizure of his vehicles is dispositive of the custody inquiry are similarly

Mr. DaCorta's attempt to draw parallels between the agents' conversation with him at his residence and the incessant questioning of the defendant in *Sprosty* also fails. While the defendant in *Sprosty* was subjected to law enforcement's "accusatory," "persistent," and harassing inquiries about his alleged misdeeds involving children, all in the presence of his mother and her friend, 79 F.3d at 642–43, Mr. DaCorta's interactions with the interviewing agents were, by contrast, cordial, calm, "very friendly," and discreet.  There is additionally no indication that agents Batsch and Volp tried to extract a confession from Mr. DaCorta by offering to broker a deal on the prosecution of any other criminal charges, as the officers sought to do in *Sprosty*.

In sum, none of the cases upon which Mr. DaCorta relies undermines my conclusion that he was not in *Miranda* custody at the time he made the challenged statements to agents Batsch and Volp.

III.

For all the reasons set forth above, I respectfully recommend that the Court deny Mr. DaCorta's *Motion to Suppress Statements Made as a Result of Custodial Interrogation on April 18, 2019* (Doc. 43).

---

unpersuasive.  *See* (Doc. 43 at 11–12) (citing *United States v. Mora-Pizarro*, 2016 WL 6871271 (W.D. Ky. Nov. 21, 2016); *United States v. Gaines*, 2015 WL 9026840 (W.D. Okla. Dec. 15, 2015); *United States v. Adames*, 885 F. Supp. 610 (S.D.N.Y. 1995)).

Respectfully submitted this 24th day of September 2021.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## **NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
Honorable William F. Jung, United States District Judge
Counsel of record